1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALAN YOCOM, | Case No.  1:21-cv-00187-JLT-HBK (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY [1] |
| v. | |
| KATHLEEN ALLISON, | FOURTEEN-DAY OBJECTION PERIOD |
| Respondent. | (Doc. No. 1) |

Petitioner Michael Alan Yocom ("Yocom" or "Petitioner"), a state prisoner proceeding pro se, has pending a petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 1, "Petition").  The Petition raises two grounds for relief:  (1) "lack of foundation"; and (2) ineffective assistance of counsel.  (*Id*. at 5, 7-13).  For the reasons set forth below, the undersigned recommends the district court deny Petitioner any relief on his Petition and decline to issue a certificate of appealability.

////

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

1

**BACKGROUND**

**A.  Procedural History**

Petitioner initiated this case on February 16, 2021 by filing a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 1).  On May 10, 2021, the Court vacated findings and recommendations to dismiss the petition as unexhausted after confirming that the California Supreme Court subsequently denied review, and ordered Respondent to respond to the Petition.  (Doc. No. 23).   Respondent lodged the pertinent state court record on May 27, 2021, and filed an answer on June 22, 2021.  (Doc. Nos. 41, 45).  On May 11, 2022, the Court directed supplemental briefing from Respondent to specifically address the merits of each ground, allegation, and argument raised in the Petition.  (Doc. No. 63).  Respondent filed a motion for reconsideration of the May 11, 2022 Order, which was denied on May 25, 2022.  (Doc. No. 67).  Respondent filed supplemental briefing on June 22, 2022, and Petitioner filed a reply to the supplemental briefing on July 5, 2022.  (Doc. Nos. 70, 72).  Petitioner filed a "2nd response" to the answer on May 8, 2023.  (Doc. No. 90).  The matter is deemed submitted on the record before the Court.

**B.  Facts Based Upon the State Court Record**

In 2018, a Tulare County jury convicted Petitioner of attempted murder of a peace officer, assault with a deadly weapon on a peace officer, criminal threats, resisting an executive officer by threats or violence with the personal use of a dangerous weapon, resisting arrest and removing and taking an officer's firearm, and violation of a restraining order.  (Doc. No. 1 at 2; Doc. No. 41-12 at 2, 12-13).   Petitioner was sentenced to 30 years to life plus 10 years for various enhancements.  (*Id*.).  On direct appeal, the state appellate court remanded on a sentencing issue regarding the calculation of Petitioner's credits, but otherwise affirmed the trial court judgment.  (*See* Doc. No. 41-12); *People v Yocom*, No. F077786, 2020 WL 5939771 (Cal Ct. App. Oct. 7, 2020).

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Court of Appeal.  Unless a petitioner demonstrates by clear and convincing evidence otherwise, a presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1);

*Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

## FACTS

### The restraining orders

Charles and Tina Yocom, defendant's father and stepmother, lived in a house on a rural property in Strathmore. On October 19, 2015, the Tulare County Superior Court granted Ms. Yocom's motion and issued a domestic violence restraining order for defendant to stay at least 100 yards away from Ms. Yocom, her house, property, and/or driveway; prohibiting defendant from harassing, stalking, attacking, assaulting, or molesting her; and contacting her, either directly or indirectly. The order was valid until October 19, 2018. On February 5, 2016, the restraining order was served on defendant.

On April 8, 2016, the court granted Mr. Yocom's motion and issued a similar restraining order against defendant with the same prohibitions, with the additional provisions to stay 100 yards away from Mr. Yocom's vehicle and workplace. Defendant was also ordered to immediately move out of his father's Strathmore residence. The order was valid until April 8, 2018. On or about April 11, 2016, the restraining order was served on defendant.

### Defendant arrives at the residence

On August 28, 2016, defendant arrived at the Yocums' residence in Strathmore and knocked on the front door. Ms. Yocum opened the door and told defendant to leave. She called the sheriff's department and watched him walk away.

Mr. Yocum was outside and saw defendant walking through his property. He told defendant to leave or he would call the police. Defendant raised his hands as if to say, " 'What's up' " or " 'I don't care,' " and kept walking.

Shortly after 5:00 p.m., Tulare County Sheriff's Deputy Douglas Reuter responded to the Yocums' residence. Reuter spoke to them and determined defendant had violated the domestic violence court orders. Defendant was not on the property. Based on their information, Reuter drove his patrol vehicle on a nearby road to look for defendant.

### Deputy Reuter's initial contact with defendant

Deputy Reuter found defendant sitting against a tree in an orchard that was about a mile and a half from the Yocums' property. Reuter parked his marked patrol vehicle and got out to talk to defendant.

Deputy Reuter had been a deputy for approximately nine months. He was wearing his sheriff's department uniform. He carried his service firearm on his left side because he was left-handed. He also had pepper spray and a baton on his belt. He did not have a Taser because he had not yet completed the required training course.

3

Deputy Reuter walked up to defendant and identified himself as a deputy. He asked defendant to stand up and defendant did so. Reuter said he needed to talk to defendant and conduct a pat down search for weapons for officer safety. Defendant turned around and placed his hands on top of his head.

Deputy Reuter testified defendant was not aggressive, but he seemed upset. Reuter conducted the pat down search without incident. He found a metal object, a length of rope, and some cash in defendant's pockets, and tossed them away. It was later determined the metal object was a small flashlight.

Deputy Reuter testified that as he conducted the pat down search, defendant kept asking if he was going to jail. Defendant started to tense up and "became agitated and his muscles were locking up as if he were going to do something."

After completing the pat down search, Deputy Reuter moved defendant's hands from above his head to behind his back, because he was going to put him in handcuffs and arrest him for violating the restraining order. While Reuter was not normally permitted to arrest a person who committed a misdemeanor outside his presence, there was an exception to that policy for a person who violated a domestic violence restraining order.

Defendant kept saying he was not going to jail. Deputy Reuter told defendant to relax and they would work it out. As Reuter reached for his handcuffs, defendant pulled his hands away from Reuter. Defendant punched Reuter in the head with his right fist. Reuter immediately sent out a radio broadcast that he was in a fight with a suspect.

Defendant walked away from Deputy Reuter and picked up the metal object, the rope, and the other items that Reuter had tossed from his pockets. Defendant backed away and faced Reuter. Reuter pulled out his baton and walked toward defendant. Defendant continued to step back and kept saying, " 'I am not going to jail.' " Reuter told defendant to relax and get on the ground.

Defendant started to walk toward Deputy Reuter. When defendant was within a few feet, Reuter pulled out his firearm with his left hand. Defendant said, " 'Don't shoot me' " and backed away. Reuter returned his firearm to his holster and secured it.

**<u>Defendant threatens Reuter</u>**

Deputy Reuter testified defendant continued to ignore his orders to get down on the ground. Reuter pulled out his baton and hit defendant on the left arm, and again ordered him to get down. Defendant refused to comply and said, " 'I'm going to f[**]king tie you up, f[**]king kill you.' " Defendant was within two feet of Reuter. Reuter continued to strike defendant with the baton. The baton strikes did not seem to have any effect on defendant.

4

Deputy Reuter testified defendant initially backed away, and then started to move toward him again. Reuter backed up and tripped on a small tree or drip line. Reuter fell on his back, dropped his baton, and rolled on his left side to protect his firearm. Defendant fell on top of Reuter's right side.

**<u>Reuter's body camera</u>**

Deputy Reuter's body camera was activated for part of the encounter and the video lasted one minute 31 seconds. The audio began 30 seconds into the video. The prosecution introduced the video and an audio transcript into evidence.

The silent part of the videotape began with Deputy Reuter and defendant in the orchard. Reuter had apparently concluded the pat down search. Defendant's hands were on top of his head, and Reuter guided defendant's hands behind his back and appeared about to place him in handcuffs. Defendant swung his hand down, pushed away from Reuter, walked forward, leaned down to the dirt, and apparently retrieved the items that Reuter found in his pockets and tossed away.

Defendant turned around and faced Deputy Reuter. Reuter walked toward defendant, and defendant walked away from him. When the audio begins, Reuter is heard repeatedly ordering defendant to get on the ground. Defendant backed away and yelled, "You better get the f[**]k away from me," and "I'm telling you mother-f[**]ker get the f[**]k away."

Deputy Reuter told defendant to relax and get on the ground. Defendant kept backing up and again told Reuter to stay away from him. Reuter pulled out his baton, kept walking toward defendant, and again told him to get on the ground.

Deputy Reuter got closer to defendant and briefly pulled out his gun with his left hand. Defendant yelled, "Don't shoot me, mother f[**]ker." Reuter returned the gun to his holster. Reuter still had the baton in his right hand, walked toward defendant, and continued to tell him to get on the ground. Defendant walked away from him and yelled, "Get the f[**]k away from me I'm gonna tie your ass up mother-f[**]ker!"

Deputy Reuter was close to defendant and swung the baton at him several times. Reuter fell, and defendant got on top of him, and they struggled with each other. According to the transcript, defendant told Reuter: "Bitch, you mother .... Bitch, I'm gonna kill you motha--." Reuter again told him to relax as they struggled, and the video ended.

Deputy Reuter testified the video ended because his body camera became disconnected during the struggle. However, the struggle continued after the body camera video ended.

////

5

**Defendant chokes Reuter**

Deputy Reuter testified after he fell, defendant fell on top of him and wrapped his arm around his neck. Defendant choked him and made it harder for Reuter to breath. Defendant hit Reuter's chest with the metal object that Reuter had earlier found in his pocket, later determined to be the small flashlight. Reuter kept telling defendant to relax, and defendant repeatedly said, " 'I am going to f[**]king kill you, I am not going to jail.' "

Deputy Reuter testified he was scared and knew the closest backup deputy was "a long way away so it was just me and him." Reuter did not try to use his pepper spray.[1]

> [FN1] Deputy Reuter testified that he knew defendant had been involved in an incident with another deputy the prior week where he had taken pepper spray away from the deputy, and Reuter believed defendant was already "more dangerous" than he had been during the prior incident.

Defendant continued to choke Deputy Reuter with one arm, dropped whatever he was holding in his other hand, and reached for Reuter's handcuffs on his belt. Reuter tried to pull defendant's arm from around his neck. Defendant grabbed the handcuffs and used them "kind of as knuckles" and hit Reuter in the chest five to 10 times.

**Defendant reaches for Deputy Reuter's firearm**

Deputy Reuter obtained control of the handcuffs and tossed them away. Defendant continued to choke Reuter with his left arm. Reuter was on his back, and defendant used his left arm to reach for his service weapon. Defendant unlocked the holster and started to pull out the firearm.

Deputy Reuter testified he reached for his gun. He realized defendant's hand was on the grip and he had pulled it out of the holster. Defendant was still on top of Reuter, and they struggled over the firearm. Reuter feared that if defendant obtained control of his firearm, defendant could shoot and kill him and any backup officers who arrived at the scene.

**Deputy Reuter fires his weapon at defendant**

Deputy Reuter gained control of his firearm and pushed defendant away from him. Reuter remained on his back on the ground. Reuter ordered defendant to stop resisting and defendant came at him again.

Deputy Reuter testified he used his firearm and discharged his entire clip of 11 shots at defendant. Reuter believed he was sitting on the ground and facing defendant when he fired.

Deputy Reuter fired his gun at defendant because believed he was going to be killed. "... I had tunnel vision. I knew he was a threat, I

knew he was – he was trying to kill me. I did what I knew at that time, what I should do, and there's a million of other things that were playing in my head. [¶] When you are in fear for your life, there's things that happen to your body and to your mind, to your senses that focus – makes all of your focus to the one thing, the threat, and things are not exactly a distance."

Deputy Reuter testified some, but not all, of his gun shots hit defendant. Defendant was wounded but walked away from Reuter and went into the orchard. Reuter repeatedly told defendant to stop and he would get him help, but defendant kept walking.

Deputy Reuter contacted dispatch, reported shorts were fired, and requested medical assistance for defendant. After defendant walked for about 50 yards, he fell to the ground. Reuter placed him in handcuffs and waited for backup and medical assistance to arrive.

Deputy Reuter testified that after the incident was over, he had cuts and bruises on his forehead, arms, and around an eye. He was also covered with defendant's blood from the gunshot wounds.[2]

> [FN 2] The Porterville Police Department subsequently investigated the shooting.

### **<u>Brandon Woods describes the shooting</u>**

Brandon Woods was driving by the orchard when he noticed a marked patrol vehicle parked in an odd position on the side of the road. Woods slowed down to see what was going on. He saw two men, later identified Deputy Reuter and defendant. They were on the ground and fighting.

Woods got out of his car to see if the officer needed help. Woods testified defendant and Deputy Reuter split apart, and both of them stood up. Reuter and defendant stood face-to-face, about seven to 10 feet apart. Woods testified defendant stood in a "threatening position" with his fists clenched at his sides, and it "sounded like he was saying something," but Woods could not hear what he said. Defendant leaned forward like he was going to run toward Reuter. Woods testified defendant acted like "he wasn't all there" and had no expression on his face.

Woods testified Deputy Reuter drew his gun and repeatedly yelled at defendant to stop and get on the ground. Defendant did not comply and walked toward Reuter. Reuter fired his gun at defendant multiple times. Woods was positive he emptied his entire clip. Defendant turned around and walked into the orchard. Reuter ordered defendant to stop and get down, but defendant kept walking. Reuter reloaded his weapon and followed defendant into the orchard. Woods backed away because he was frightened and did not hear any more gunshots.

////

////

7

**Prior incident**

On August 8, 2016, Tulare County Sheriff's Sergeant Victor Bonilla was the shift supervisor at the Porterville substation. Defendant was being transferred from the holding cell into a van for transportation to the county jail. He jumped out of the van and managed to get out of the leg shackles. Several deputies tried to restrain him, and a struggle ensued on the ground; defendant took a can of pepper spray away from Deputy Pinheiro's belt. As Sergeant Bonilla and the other deputies got defendant into the van, defendant tried to kick Bonilla.[3]

> [FN 3] The court granted the prosecution's motion to introduce this evidence as relevant to motive and intent pursuant to Evidence Code section 1101, subdivision (b).

## DEFENDANT'S TESTIMONY

Defendant testified he was sitting under a tree on the property of Gary Fox, someone he knew well, and had the right to be on private property. On cross-examination, defendant admitted he went to his parents' house but insisted he had an ownership interest in the property. While the prosecution had introduced the restraining orders into evidence that showed he had been served with them, defendant testified he did not know about the orders and had never been served with them.

Defendant testified Deputy Reuter "appear[ed] out of nowhere" and surprised him. Reuter was in uniform and seemed to be a deputy, but he never identified himself and defendant had never seen him before.

Deputy Reuter told defendant to "turn around." Defendant obeyed and complied with the pat down search. Reuter took a "substantial amount of money" and other "personal, sentimental" items out of his pockets, including "gold rings," part of an old microscope, and a length of rope he had just bought. Defendant claimed he had $800 in his pockets even though the police report said the total cash was $102. Reuter threw everything to the side.

Defendant testified that based on Deputy Reuter's conduct, he believed Reuter was posing as an officer to rob him. Defendant tried to pick up his property and told Reuter to stay away from him. Reuter used the baton against him, and defendant feared for his life and thought it " 'was all over with.' "

Defendant felt it was necessary to defend himself because he was on private property and suspicious of Deputy Reuter.

Defendant raised his arms to block Deputy Reuter's baton, pushed him away, and did not throw any swings at him. Reuter hit him with the baton. Defendant again tried to pick up his belongings and Reuter pulled his gun.

8

Defendant testified Deputy Reuter returned the gun to his holster and initially said he did not fire any shots. However, defendant also claimed Reuter fired one shot and hit him in the head, even though it could not be heard on the body camera footage.

Defendant testified he did not recall making any statements or threats to Deputy Reuter. Defendant conceded he might have made some "confrontational" statements. He testified that if he did make any statements like that, it would have been "in the excitement" and "because [of] the anxiety and the emotion of it all, it was in a self-defense type thing."

Defendant testified they got into a "wrestling fight." He said he might have used his fists, but it was all self-defense, and he never intended to take Deputy Reuter's firearm or kill him. Defendant conceded that Reuter's body camera showed that he fell on top of Reuter.

Defendant testified Deputy Reuter lied in court about everything and disagreed about what Reuter's body camera video showed. Defendant said he never put his arm around Reuter's neck; he never tried to choke Reuter; and he did not remove Reuter's handcuffs and hit Reuter with them. Defendant also disputed the accuracy of the body camera audio and that he said he was going to tie up and kill Reuter. After the body camera video was played again, defendant said, "If I said it, I said it. I am already in a confrontational situation with him because he is charging me, hitting me with a baton, and then he shoots me in the head."

Defendant testified he was walking away from Reuter when he was shot 11 times in the back, and he was also hit in the arms, torso, chest, and head. On cross-examination, the prosecutor asked defendant to review his medical records and photographic exhibits. At one point, defendant conceded they showed he was not shot in the back.[4] The prosecutor also pointed out that his medical records showed the head injury was from a baton blow, but defendant insisted that was a gunshot wound.

> [FN 4] Neither party called a physician or other medical expert to testify about the nature and extent of defendant's gunshot wounds. According to the probation report, defendant was shot in his right inner shoulder, left inner forearm, left elbow, left upper thigh, left outer forearm, and a grazing gunshot wound to his forehead.

Defendant also testified that Deputy Pinheiro's account of the prior incident was not accurate. He testified that he never kicked or resisted any officers, and he never took a deputy's pepper spray. Instead, defendant said he was "brutally assaulted" by the deputies that day because they "slammed" him down in the transportation van while he was shackled.

Defendant admitted that in November 2008, he was convicted of felony grand theft, receiving stolen property, and evading, but

claimed the convictions had been reversed. He was convicted of resisting a peace officer in December 2003 and November 2008.

**REBUTTAL**

As rebuttal evidence, the court granted the People's motion to introduce additional evidence about defendant's prior encounters with law enforcement officers.

Deputy Jason Baillie testified he was involved in the altercation between defendant and several other deputies on August 8, 2016. Defendant was in leg shackles and loaded into the transportation van for the drive from the substation to the jail. Defendant kicked the closed doors and demanded to be escorted out so he could smoke a cigarette. Baille said no and started to drive out of the substation. Defendant kept violently kicking the doors, and Baille decided to remain in the substation to deal with the situation in a secure area.

After he parked at the substation, Deputy Baille opened the van's doors and ordered defendant out. Defendant refused and cursed him. Baille tried to pull defendant out and defendant kicked him. Deputy Pinheiro and other deputies tried to restrain defendant. Sergeant Bonilla ordered defendant to calm down. Defendant continued to kick and struggle, and he managed to swing off his leg shackles. Defendant grabbed pepper spray from Pinheiro's belt. Defendant was ultimately restrained, and the deputies regained control of the pepper spray before defendant used it.

On May 18, 2016, defendant was involved in another incident when he was contacted by Deputy Pinheiro. Defendant ran to a bicycle and rode away. He was subsequently apprehended and resisted the deputies who were arresting him. When Pinheiro contacted defendant that day, defendant ran to a nearby bicycle and fled. Defendant was ultimately apprehended, and he resisted the arresting deputies.

The court advised the jury that in April 2016, defendant was placed on summary probation for a misdemeanor violation of the restraining order.

(Doc. No. 41-12 at 2-12); *People v Yocom*, No. F077786, 2020 WL 5939771, at *1-6 (Cal Ct. App. Oct. 7, 2020).

## II.  APPLICABLE LAW

### A.  AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

1   first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

2   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

3   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

4   the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

5   *Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits

6   relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11  28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

12  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

13      "Clearly established federal law" consists of the governing legal principles in the

14  decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

15  U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

16  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

17  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

18  governing law set forth by Supreme Court case law; or (2) reached a different result from the

19  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

20  12, 16 (2003).

21      A state court decision involves an "unreasonable application" of the Supreme Court's

22  precedents if the state court correctly identifies the governing legal principle, but applies it to the

23  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

24  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

25  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

26  extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362,

27  407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas

28  relief so long as fair-minded jurists could disagree on the correctness of the state court's

11

1  decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

2  state court decision "was so lacking in justification that there was an error well understood and

3  comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

4          When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

5  State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

6  the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*

7  *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

8  merely because the federal habeas court would have reached a different conclusion in the first

9  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

10         As discussed earlier, for the deferential § 2254(d) standard to apply there must have been

11  an "adjudication on the merits" in state court.  An adjudication on the merits does not require that

12  there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S.

13  at 98.  "When a federal claim has been presented to a state court and the state court has denied

14  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

15  of any indication or state-law procedural principles to the contrary."  *Id*. at 99.  "The presumption

16  may be overcome when there is reason to think some other explanation for the state court's

17  decision is more likely."  *Id*. at 99-100.  This presumption applies whether the state court fails to

18  discuss all the claims or discusses some claims but not others.  *Johnson v. Williams*, 568 U.S.

19  289, 293, 298-301 (2013).

20         While such a decision is an "adjudication on the merits," the federal habeas court must

21  still determine the state court's reasons for its decision in order to apply the deferential standard.

22  When the relevant state-court decision on the merits is not accompanied by its reasons,

23              the federal court should "look through" the unexplained decision to
24              the last related state-court decision that does provide a relevant
                rationale. It should then presume that the unexplained decision
25              adopted the same reasoning.  But the State may rebut the
                presumption by showing that the unexplained affirmance relied or
26              most likely did rely on different grounds than the lower state court's
                decision, such as alternative grounds for affirmance that were
27              briefed or argued to the state supreme court or obvious in the record
                it reviewed.

28  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

1  court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

2  decision, as AEDPA directs us to do." *Id*. at 1196.

3
> When . . . there is no reasoned state-court decision on the merits,
> the federal court "must determine what arguments or theories . . .
4
> could have supported the state court's decision; and then it must ask
> whether it is possible fairminded jurists could disagree that those
5
> arguments or theories are inconsistent with the holding in a prior
> decision of this Court." *Richter*, 562 U.S. at 102.  If such
6
> disagreement is possible, then the petitioner's claim must be denied.
> *Ibid*.
7

8  *Sexton*, 138 S. Ct. at 2558.

9                                **III.  ANALYSIS**

10        The California Court of Appeal and the California Supreme Court summarily rejected

11  Petitioner's claims. (Doc. Nos. 41-15, 41-19, 41-24).  The Court presumes the state court

12  adjudicated the claim on the merits in the absence of any identified state-law principle to the

13  contrary.  *See Richter*, 562 U.S. at 99.  Accordingly, the deferential standard of § 2254 applies,

14  and as there is no reasoned state court decision as to the merits of Petitioner's claims, the Court

15  considers what arguments could have supported the state court's decision, and then ask whether it

16  is possible fair-minded jurists could disagree about whether those arguments or theories are

17  inconsistent with a prior Supreme Court holding.  *Id*. at 102.

18        **Ground One: "Lacks Foundation"**

19             **1.  Background**

20        To the extent discernable, Petitioner argues the trial court erred by failing to compel the

21  City of Porterville's police department to testify as to their "jurisdictions and their probable cause

22  to seize Petitioner for any crime in the case against him," and improperly admitting evidence "by

23  unlawful stipulation."  (Doc. No. 1 at 7-10).  Petitioner also appears to allege "all of the physical

24  material evidence" disappeared or was destroyed, and his Sixth Amendment right to confrontation

25  was violated because "the police" did not testify.  (*Id*.).

26        In its Answer, Respondent presents a single page of conclusory statements, with

27  corresponding case law noted only in footnotes, arguing that "if" Plaintiff's "varied allegations"

28  included any Fourth Amendment claim, it would fail categorically; "if" Plaintiff claimed a Fourth

Amendment bar to trial pursuant to "illegal arrest" his claim would fail; and "if" the allegations included a claim that law enforcement must use every investigatory tool available and/or included a claim to discovery, no Supreme Court case has clearly established such rights.  (Doc. No. 45 at 10).

### 2.   Petitioner is Not Entitled to Relief

First, to the extent Petitioner's claims the trial court misapplied California's evidentiary rules, the claim is not cognizable on habeas review.  Federal habeas corpus relief "does not lie for errors of state law," *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and this court is bound by the state court's determination based on state law, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Petitioner claims that "alleged evidence in the case [was] improperly admitted in to evidence," and he generally argues "lacks foundation" presumably based on the lack of testimony from the Porterville Police department.  (Doc. No. 1 at 5, 7).  Initially, Petitioner fails to identify which, if any, specific evidence was improperly admitted.  Further, even were the Court to accept any argument that that the trial court erred in finding a sufficient foundation for the challenged evidence, Petitioner would not be entitled to habeas relief.   It is well-settled that issues of state law admissibility and foundation are not cognizable on federal habeas review.  *See Johnson v. Sublett*, 63 F.3d 926, 931 (9th Cir. 1995) (denying habeas relief based on claim that admission of wooden clubs found at defendant's house was unconstitutional due to lack of evidence linking clubs to crimes because claim merely "present[ed] state-law foundation and admissibility"); *Gonzalez v. Guzman*, 2023 WL 7391687, at *7 (C.D. Cal. Sept. 12, 2023) ("State law issues concerning authentication of evidence are not cognizable on federal habeas review.").

Second, to the extent Petitioner asserts violation of his Fourth Amendment rights based on lack of probable cause to seize Petitioner "for any crime," this claim is not cognizable on federal habeas review.  (Doc. No. 1 at 10).  The Fourth Amendment protects against "unreasonable searches and seizures" and provides, *inter alia*, that no search warrant shall be issued "but upon probable cause."  U.S. Const. amend IV.   In *Stone v. Powell*, the Supreme Court held that when a

14

state court has provided petitioner with a full and fair opportunity to litigate a Fourth Amendment claim, federal habeas relief is not available on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial.  428 U.S. 465, 494-95 (1976); *Newman v. Wengler*, 790 F.3d 876, 878-80 (9th Cir. 2015) (holding *Stone* remains good law after AEDPA).  Thus, "[t]he relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Newman*, 790 F.3d at 880; *Moormann v. Schriro*, 426 F.3d 1044, 1053 (9th Cir. 2005) (finding that petitioner had a full and fair opportunity to litigate his Fourth Amendment claim because he raised the claim in a pre-trial motion, the trial court held a hearing and denied his motion, and an appellate court reviewed the trial court's decision).

Here, Petitioner has not alleged that the state court denied him a full and fair opportunity to litigate a Fourth Amendment claim, yet alone demonstrated a denial of such opportunity, regardless of whether he chose to do so.  Thus, any argument based on lack of probable cause to seize Petitioner is not cognizable on federal habeas review under *Stone*.  Moreover, as noted by Respondent, any challenge to Petitioner's conviction based on alleged improprieties with his pre-trial arrest or detention would be similarly unavailing.  (Doc. No. 45 at 10 (citing *United States v. Crews*, 445 U.S. 463, 474 (1980) ("An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.")); *see also Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) ("[I]llegal arrest or detention does not void a subsequent conviction.  Thus, … although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trail without a determination of probable cause.").

Third, to the extent discernable, Petitioner appears to assign error because the Porterville police department was "negligent and mishandled" their investigation, that the body camera "disappears and/or is destroyed never being logged into evidence," and "thirty two pieces of ballistic or forensic evidence disappeared from the case."  (Doc. No. 1 at 8-10).  The Court liberally construes Petitioner's argument as asserting a due process claim.  The government's failure to preserve evidence can violate a defendant's right to due process if the unavailable

15

evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 467, 489 (1984). However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Sanders v. Cullen*, 873 F.3d 778, 811 (9th Cir. 2017). Rather, "[t]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 56, n *. Petitioner attaches a police report to the Petition listing 32 items "collected as evidence" without providing any allegations or explanation as to when or how these items allegedly "disappeared;" nor does Petitioner make any specific argument as to the exculpatory value of any of these 32 items, to the extent they constituted evidence. *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (holding that conclusory allegations made with no reference to the record or any document does not merit habeas relief); *McCarty v. Kernan*, 2021 WL 3630378, at *18 (E.D. Cal. Aug. 17, 2021) ("Habeas relief is not warranted where the claim is based on mere speculation."). Moreover, Petitioner repeatedly argues that the police were "negligent" in their handling of the investigation (Doc. No. 1 at 8-9), which does not rise to the level of bad faith required under *Youngblood. See United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013); *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness."). Thus, to the extent the Petition argues evidence was mishandled, the foregoing arguments could have supported the state court decision that there was no violation of Petitioner's due process rights, and led a fairminded jurist to disagree that those arguments are inconsistent with the holding in clearly established Supreme Court precedent. *See Richter*, 562 U.S. at 102.

Fourth, Petitioner appears to allege his Sixth Amendment right to confrontation was violated because "[t]he police were never called to give testimony as to any police report concerning the investigation of the case itself, interviewing of witnesses, evidence gathering and handling, and the probable cause to seize the petitioner for any crime." (Doc. No. 1 at 10). The

Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . .." U.S. Const., Amend. VI. A federal habeas petitioner may be granted relief on a confrontation clause claim if he can prove a Sixth Amendment violation under *Crawford v. Washington*, 541 U.S. 36, 59 (2004). The confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination" regardless of whether the statements are deemed reliable. *Crawford*, 541 U.S. at 53-54 (2004); *Davis v. Washington*, 547 U.S. 813, 821(2006). In general, testimonial statements are "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51. Here, Petitioner fails to identify any "testimonial statements" by "the police" introduced at trial. *See Jones*, 66 F.3d at 204-05 (conclusory allegations made with no reference to the record or any document does not merit habeas relief). Therefore, to the extent asserted, Petitioner cannot demonstrate a violation of his confrontation rights under the Sixth Amendment. *See United States v. Avery*, 2023 WL 167382 (D. Alaska Jan. 12, 2023) ("No testimony from the other two witnesses was ever presented. Therefore, no violation of [Petitioner's] Confrontation Clause right could have occurred."); *United States v. Heck*, 499 F.2d 778, 789 n.9 (9th Cir. 1974) ("A defendant has no right to confront a 'witness' who provides no evidence at trial. Nor is the government required to call all of the witnesses to a crime.") (internal citations omitted).

For the foregoing reasons, the state court's rejection of Petitioner's "lacks foundation" claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. The undersigned recommends that ground one be dismissed as failing to state a federal claim and otherwise without merit .

### B. Ground Two: Ineffective Assistance of Counsel

#### 1. Background

In his second ground for relief, Petitioner argues his trial counsel was ineffective because he failed to compel "the police to testify as to the ballistics and forensics of the case," including

"where each of the bullets fired from," "where the blood trail started from," and that he was shot in the head "before he hit the ground." (Doc. No. 1 at 11-12).  To the extent discernable, Petitioner also argues this evidence could have been used to impeach Deputy Reuter's testimony. (*Id*. at 12-13).  The entirety of Respondent's argument to this ground in its Answer is as follows: "given the utter failure of the above theories, it was reasonable to deny relief insofar as Petitioner might have been understood to claim that counsel had to operate from such erroneous theories, or had to make trial-level claims or objections based on the theories." (Doc. No. 45 at 10).

### 2.  Petitioner is Not Entitled to Relief

The Court considers the state court record and appliable federal law and finds ground two should be denied on the merits.  The Court engages in a two-step analysis when considering a petitioner's ineffective assistance of counsel ground for relief.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Under the first prong of that test, the petitioner must prove that his attorney's representation fell below an objective standard of reasonableness.  *Id*. at 687-88.  To demonstrate deficient performance, the petitioner must show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000).  In reviewing trial counsel's performance, however, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  Only if counsel's acts and omissions, examined within the context of all the circumstances, were outside the "wide range" of professionally competent assistance, will petitioner meet this initial burden. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986); *Strickland*, 466 U.S. at 689-90.

Under the second part of *Strickland's* two-prong test, the petitioner must show that he prejudiced by counsel's conduct.  466 U.S. at 694.  Prejudice is found where there is a reasonable probability that, but for his counsel's errors, the result would have been different.  *Id*.  The errors must not merely undermine confidence in the outcome of the trial, but must result in a proceeding that was fundamentally unfair.  *Williams*, 529 U.S. at 393 n.17; *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  The petitioner must prove both prongs:  deficient performance and prejudice.  A

18

court need not, however, determine whether counsel's performance was deficient before determining whether the petitioner suffered prejudice as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Here, the Court finds that Petitioner's ground two can be disposed on the prejudice prong. To establish prejudice caused by failure to call a witness, a petitioner must show that the witness was likely to have been able to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003); *Young v. Gipson*, 163 F. Supp. 3d 647, 688 (N.D. Cal. 2015). A petitioner's speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001), *amended*, 253 F.3d 1150 (9th Cir. 2001); *Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000) (rejecting ineffective assistance of counsel based on trial counsel's failure to interview or call an alibi witness when there was no evidence the witness would have testified favorably for the defense).

First, Petitioner fails to identify which potential "police" witnesses aside from Detective W. Martin would have provided testimony. Second Petitioner does not identify what if any favorable testimony concerning the ballistic evidence that these witnesses would have given sufficient to change the outcome of the trial. Petitioner points only to Detective Martin's comment in his report that one shot grazed Petitioner's forehead as critical exculpatory testimony. (Doc. No. 1 at 12, 28). The record reveals that, in addition to the testimony of the witness, Mr. Brandon Woods, who described the shooting, the record reflects that the jury saw and heard the video evidence from Deputy Reuter's body camera, heard the cross-examination testimony from Deputy Reuter as to when he fired his weapon at Petitioner, and heard Deputy Reuter's testimony about the relative positions of himself and Petitioner when he fired his weapon. (Doc. No. 41-6 at 471, 522-29). The jury also heard Petitioner's own testimony that he feared for his safety when he was stopped by Deputy Reuter, he acted only in self-defense, he did not intend to kill Deputy

Reuter, he did not fight with or choke Deputy Reuter, he complied with Deputy Reuter's pat down, and he did not attempt to take his firearm.  (*Id*. at 598-607, 640-55, 668-74).  Particularly relevant to his arguments here, is that Petitioner offered testimony that Deputy Reuter shot him in the head without provocation and shot him in the back of his body while Petitioner was walking away.  Further, defense counsel submitted into evidence a photograph that revealed evidence of a "graze wound to the left side of [his] forehead," as well as photographs that Petitioner testified were accurate portrayals of bullet wounds to his left buttocks, injury to the left side of his head, injury after bullet wound to the back of his right arm, bullet exit wounds on his left wrist and forearm.  (*Id*. at 604-05, 626-39).  Based on this record, the undersigned finds Petitioner cannot show prejudice for counsel's alleged failure to present Detective Martin's testimony  or other testimony as to "ballistics and forensics," to impeach Deputy Reuter's testimony, as such testimony would have been cumulative of the witnesses' testimony, including his own.  *See Chapman v. Lampert*, 371 F. App'x 742, 746 (9th Cir. 2010) ("The failure to present a witness at trial whose testimony would only be cumulative of other witnesses' testimony cannot show prejudice under *Strickland*."); *Mickey v. Ayers*, 606 F.3d 1223, 1247-48 (9th Cir. 2010) ("marginal, cumulative comments do not create a 'reasonable probability' of altering the jury's calculus"); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984).

For all these reasons, the state court could have determined that Petitioner failed to show a reasonable probability that Detective Martin or "the police" been called to testify as to "ballistics and forensic evidence" to impeach the testimony of Deputy Reuter, the outcome of the trial would have been different.  *See Strickland*, 466 U.S. at 694; *see also Richter*, 562 U.S. at 103 (petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").  Accordingly, the state court's rejection of Petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  The undersigned recommends that ground two be denied as without merit.

////

## IV.  CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **RECOMMENDED**:

The Petition (Doc. No. 1) and a certificate of appealability be denied.

### NOTICE TO PARTIES

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14) days after being served with these findings and recommendations, a party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:    December 22, 2023

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE